FILED'08 SEP 10 15:42USDC-ORM

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | | |
|---|---|---|
| PENNY D. MUNROE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CV 07-6289-CL |
| v. | ) | |
| | ) | FINDINGS AND |
| MICHAEL J. ASTRUE, Commissioner of Social | ) | RECOMMENDATION |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

CLARKE, Magistrate Judge,

Plaintiff Penny Munroe challenges the Commissioner's decision denying her application for

disability insurance benefits under Title II of the Social Security Act. The court has jurisdiction

under 42 U.S.C. § 405(g). The Commissioner's decision should be AFFIRMED.

The court reviews the Commissioner's decision to ensure that proper legal standards were

applied and the findings are supported by substantial evidence in the record. 42 U.S.C. § 405(g);

*Batson v. Comm'r of the Soc. Sec. Admin.,* 359 F.3d 1190, 1193 (9th Cir. 2004). The administrative

1 - FINDINGS AND RECOMMENDATION

law judge ("ALJ") applied the five-step sequential disability determination process set forth in 20 C.F.R. § 404.1520. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Munroe contends the ALJ failed to properly identify all of her severe impairments at step two of the process. She argues the ALJ also failed to accurately assess her residual functional capacity ("RFC"). Munroe contends these errors led the ALJ to erroneously conclude she remained capable of performing work in the national economy at step five of the decision making process.

Munroe alleged disability beginning in December 1996 due to degenerative joint disease, degenerative disc disease, a bone spur in the neck, osteoarthritis of the neck, knees, back, and hips, and high blood pressure. Admin. R. 63. A prior administrative decision adverse to Munroe became final on December 3, 1997, making her ineligible for benefits before and including that date. *Id.* at 360. 20 C.F.R. § 404.988. *See Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985). Munroe satisfied the insured status requirements for a claim under Title II through December 31, 2001, and must establish she was disabled on or before that date to prevail on her claim. Admin. R. 55, 357. 42 U.S.C. § 423(a)(1)(A). *See Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998).

## I.    Severe Impairments

Munroe contends the ALJ erred at step two by failing to identify degenerative joint disease, a shoulder separation, and osteoarthritis as severe impairments at step two of the decision making process.

At step two, the ALJ must determine whether the claimant has any combination of impairments which meets the regulatory definition of severe by significantly limiting her ability to do basic work activities. 20 C.F.R. § 404.1520(c). If the claimant is not severely impaired according to this definition, the ALJ must find the claimant not disabled. In such cases, the decision-making

process terminates at step two.  20 C.F.R. § 404.1520(a)(4)(ii).  The step-two inquiry is a *"de minimis* screening device to dispose of groundless claims." *Smolen v. Chater,* 80 F.3d 1273, 1290 (9th Cir. 1996).

Here the ALJ found Munroe's combined impairments satisfied the step-two threshold. Admin. R. 14.  The ALJ continued the sequential decision-making process until reaching a determination at step five.  Any error in designating specific impairments severe did not prejudice Munroe at step two, because step two was resolved in her favor.  *See Burch v. Barnhart,* 400 F.3d 676, 682 (9th Cir. 2005)(Any error in omitting obesity from list of severe impairments at step two harmless where step two was resolved in claimant's favor).

Munroe's argument may be construed as a challenge to the remaining steps of the ALJ's decision.  Once a claimant has surmounted step two by showing severe impairment, the ALJ must consider the functional limitations imposed by all medically determinable impairments in the remaining steps of the decision-making process, including impairments the ALJ did not find severe at step two. 20 C.F.R. § 404.1523; Social Security Ruling ("SSR") 96-8p, 1996 WL 374184. Here, the ALJ was required to consider any functional limitations imposed by degenerative joint disease, shoulder separation, and osteoarthritis at each step in the process.  It is therefore useful to identify any such functional limitations before proceeding to review the remaining steps of the ALJ's decision.

Munroe did not present evidence that she had functional limitations from degenerative joint disease during the relevant period.  Munroe had a history of lower back pain and, in March 1995, diagnostic imaging showed slight facet joint narrowing at one level in the lumbosacral region of the spine. Admin. R. 273.  In October 1997, shortly before the beginning of the period under review,

3 - FINDINGS AND RECOMMENDATION

Munroe reported joint stiffness, flu-like symptoms and other ailments which had persisted for two weeks. These were thought to be side effects of the medication Neurontin and abated after her dosage was adjusted. *Id.* at 151. In November 2001, Munroe reported subjective pain in her knee joints. Diagnostic images were essentially normal, showing no significant joint space narrowing, osteophytosis, fracture, or diminished bone density. *Id.* at 262. Munroe does not identify any other evidence of degenerative joint disease prior to the expiration of her insured status in December 2001. She does not identify any evidence of functional limitations attributable to degenerative joint disease which the ALJ failed to consider. Accordingly the ALJ did not err in her consideration of the functional limitations related to degenerative joint disease at any step in the decision-making process.

In August 2001, diagnostic images showed a grade 2 shoulder separation on the left. *Id.* at 265. Munroe complained of shoulder pain in November 2001, but did not describe the intensity, persistence, frequency or limiting effect of the pain. *Id.* at 260. The left shoulder pain abated and then returned for several weeks in June and July 2002, after the expiration of Munroe's insured status. *Id.* at 251. Later diagnostic images of the shoulder were normal. *Id.* at 227. The evidence Munroe identified supports the diagnosis of a mild to moderate shoulder separation and intermittent left shoulder pain during the relevant period. She did not identify evidence of any specific functional limitation which the ALJ should have included in her RFC assessment but failed to consider. Accordingly, the ALJ did not err in her consideration of the functional consequences of Munroe's shoulder separation during the relevant period.

Munroe alleged her ability to work is limited by osteoarthritis of the back, neck, knees, and hips. *Id.* at 63. In December 2000, Munroe was examined by Shari Allen, F.N.P., in the office of her primary care physician, Gregory Falk, M.D. Munroe complained of back pain with spasms.

Allen diagnosed osteoarthritis and lumbar strain. With respect to functional limitations, Allen noted only that Munroe had pain with twisting, especially to the right. *Id.* at 270.

Munroe carried the osteoarthritis diagnosis in subsequent progress notes from Dr. Falk's office, but there was no mention of any functional limitations attributable to the diagnosis. *Id.* at 268-69. In November 2001, bilateral knee x-rays failed to show evidence osteoarthritis. *Id.* at 262. Despite this, Dr. Falk diagnosed osteoarthritis in both knees and administered a series of weekly injections of Hylagen Synvisc in both knees. *Id.* at 259. On November 27, 2001, Munroe told Dr. Falk her knees had never felt better and in December 2001, when her insured status expired, Munroe reported her knees were fine. *Id.* at 257-58.

In assessing Munroe's RFC, the ALJ found she was limited to occasional twisting, consistent with the only functional limitation Munroe reported to nurse practitioner Allen. Munroe does not identify any other evidence of functional limitations attributable to osteoarthritis, which the ALJ failed to consider. Accordingly, the ALJ did not err in her consideration of the functional impact of osteoarthritis during the relevant period.

## II.   Residual Functional Capacity

The RFC assessment describes the work-related activities a claimant can still do on a sustained, regular and continuing basis, despite the functional limitations imposed by her impairments. 20 C.F.R. § 404.1545(a); SSR 96-8p, 1996 WL 374184. The RFC assessment must be based on all the evidence in the case record, and the ALJ must consider all allegations of limitations and restrictions. SSR 96-8p, 1996 WL 374184 * 5.

Munroe contends the ALJ failed to accurately assess her RFC because she improperly discredited Munroe's testimony and discounted the findings of two treating physicians. As a result,

Munroe argues, the ALJ's RFC assessment did not accurately reflect all of her functional limitations and led the ALJ to erroneously conclude she remained capable of performing work during the relevant period.

### A.    <u>Credibility Determination</u>

Munroe testified that she worked as an industrial seamstress for nine years ending in 1997. She stopped working due to back pain extending from her neck down to her hips. She did not return to work because her physician, Dr. Karasek, would not give her a work release. Admin. R. 361-62. Her last work required twisting, turning, lifting, and standing for extended periods, all of which exacerbated her chronic pain. *Id.* at 363. Munroe testified that during the relevant period of time, she could stand in place for about 10 minutes, walk for about 10 minutes, sit for about 20 minutes, and lift only about 5 pounds. *Id.* at 364.

Munroe testified she had knee problems in 2001 which were so severe she could not go down two stairs. *Id.* at 365. She received injections in her knee joints, but obtained no relief from this procedure. *Id.* at 366. She had a left shoulder separation from 2001 to 2005. *Id.* at 366-67. During the relevant period she had extreme neck pain 3 or 4 days a month, regardless of her activity level. On those days she would not get out of bed and could not think straight. *Id.* at 376-77. She had muscle spasms daily. *Id.* at 378. She testified she could not work during the relevant time because she could not think straight, either due to pain or due to the side effects of pain medications. *Id.* at 379.

Munroe testified her activities during the relevant period were very limited. She did not do a very good job of maintaining her household and had little social activity. *Id.* at 365. She usually spent 1 to 2 hours each day lying down. *Id.* at 367. She was able to drive a car. *Id.* at 368. Munroe

slept and performed sedentary activities like reading and paying bills in a recliner because lying flat was painful. *Id.* at 372-73. She was able to garden because she could alternate positions as needed to remain comfortable. Despite this, she required rest every 30 minutes while gardening. *Id.* at 373.

The ALJ accepted that Munroe suffered from pain which limited her to a reduced range of light and sedentary work, with the option to change positions at will between sitting and standing, excluding work which requires overhead reaching, exposure to hazards or moving equipment, or more than occasional twisting. He found Munroe limited to simple, repetitive tasks of no more than 1 to 3 steps. *Id.* at 15. The ALJ rejected Munroe's testimony that she has functional limitations exceeding those in this RFC assessment and cannot perform substantial gainful activity.

In deciding whether to accept a claimant's statements about her symptoms, an ALJ must perform two stages of analysis. The first stage is a threshold test in which the claimant must produce objective medical evidence of an underlying impairment that could reasonably be expected to produce the symptoms alleged. *Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996); *Cotton v. Bowen*, 799 F.2d 1403, 1407-08 (9th Cir. 1986). There is no dispute about the first stage in this case.

At the second stage of the credibility analysis, an ALJ may discredit a claimant's testimony regarding the severity of symptoms by providing clear and convincing reasons for doing so. *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993); *Smolen*, 80 F.3d at 1283. The ALJ must make findings that are "sufficiently specific to permit the reviewing court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).

The ALJ may consider objective medical evidence and the claimant's treatment history. *Smolen*, 80 F.3d at 1284. The ALJ may also consider the claimant's daily activities, work record,

and the observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Id.*; SSR 96-7p, 1996 WL 374186. In addition, the ALJ may employ ordinary techniques of credibility evaluation, such as the claimant's prior inconsistent statements concerning the symptoms and other statements by the claimant that appear to be less than candid. *Id. See also* SSR 96-7p. Here the ALJ considered these factors and made specific findings to support her credibility determination.

The ALJ concluded the objective medical evidence and treatment history did not support the functional limitations Munroe described in her testimony and allegations. The ALJ found the symptoms Munroe claimed out of proportion to the limited medical findings. Admin. R. 18. Munroe reported a long history of back pain dating to childhood injuries. *Id.* at 311, 351. Notably, these chronic back problems did not prevent Munroe from working into 1997.

In November 1996, Munroe complained of pain in the lower back and both legs, exacerbated by rotating in her chair and standing on hard surfaces for extended periods in her work as a seamstress. Diagnostic images showed degenerative changes, but only slight facet joint narrowing in the lumbar spine. *Id.* at 272-73. Michael Karasek, M.D., a specialist in neurology and pain management, obtained negative physical and neurological examinations. *Id.* at 171-72. In March 1997, Munroe complained of lower back pain radiating to the lower extremities. Patrick Golden, M.D., a neurosurgeon, administered a discogram which demonstrated diffuse degenerative changes and central herniation at L5-S1, which produced concordant pain, and another area of degenerative change without concordant pain. Dr. Golden found range of motion limitations and signs of proximal muscle weakness in the hip and thigh, but straight leg raises produced no evidence of a true

sciatic character and all neurological signs were within normal limits.  Dr. Golden recommended

treatment options, but Munroe failed to return for follow-up care.  *Id.* at 143-44.

In May 1997, Munroe decided to continue with a home exercise program and wait instead

of proceeding with treatment options suggested by Dr. Golden.  In September 1997, Munroe was

"doing fairly ok," with objective findings on physical examination within normal limits and stable.

*Id.* at 151-52.

The period of concern in this case began December 4, 1997.  A few days later, Dr. Karasek

released Munroe to return to work, noting she was "released for sedentary to light" activities.  *Id.* at

146.  On physical examination, Dr. Karasek found Munroe okay and stable.  *Id.*  In July 1998, Dr.

Karasek had normal findings on examination and Munroe continued to be stable.  Dr. Karasek

transferred Munroe's care to Dr. Falk, her primary care physician, noting Munroe had a "permanent

sedentary light duty restriction" and required little treatment.  *Id.*

In April 2000, Munroe reported a lumbosacral strain.  She was not taking any pain

medication and Dr. Falk started her on Norco. *Id.* at 271.  In December 2000, Munroe reported she

had fallen to the floor with muscle spasms while grocery shopping. She did not seek urgent care at

the time of the fall.  *Id.* at 270.  In May 2001, Munroe did not feel her current medication was

adequate and asked to start Vicodin.  *Id.* at 268.  In August 2001, an x-ray report indicated Munroe

had marked degeneration in the cervical spine at C4, C5, and C6.  Images of the left shoulder showed

a relatively mild (grade 2) separation.  *Id.* at 265.

In November 2001, an x-ray report of the knees was essentially normal.  *Id.* at 262.  Munroe

complained of chronic knee pain, however.  Dr. Falk administered a series of weekly injections of

Hylagen Synvisc in both knees.  *Id.* at 259.  On November 27, 2001, Munroe told Dr. Falk her knees

had never felt better, but she continued to have chronic back pain. *Id.* at 258. In December her knees were fine, but she had neck and back pain. *Id.* at 257.

Munroe's insured status under the Social Security Act expired on December 31, 2001. She continued to receive medication management from Dr. Falk's office. In August 2002, she described her pain as 3 to 4 on a scale of 10 with medication, and 7/10 without medication. *Id.* at 250. By June 2003, the pain had worsened to 7/10 with medication and 9/10 without. *Id.* at 249.

In January 2006, four years after Munroe's insured status expired, MRI studies showed mild disc dessication, a slight potential for nerve root impingement, but no definite evidence of such impingement, and mild to moderate degenerative changes in the lumbar spine. *Id.* at 337-38. In the cervical spine, the studies showed multilevel degenerative changes with spinal canal stenosis and likely nerve root compression due to moderate to severe foraminal narrowing. *Id.* at 339-40. Christopher Noonan, M.D., a spine specialist, examined Munroe in February 2006 and obtained generally normal findings in his physical and neurological examinations. *Id.* at 313. He acknowledged the significant degenerative changes shown in the MRI studies, but recommended against surgical intervention. *Id.* at 314.

The ALJ acknowledged the objective findings demonstrated degenerative changes in the spine that would support some degree of pain in the lower back and neck. *Id.* at 14, 18. The ALJ correctly noted that clinical findings during the relevant period indicated normal sensory, motor and reflex functions. *Id.* at 16, 17, 146. Physical examinations noted gait, stance, strength, sensation, and reflexes essentially intact. *Id.* at 18, 296. No treating source found neurological deficits during the relevant period. When Munroe complained of intractable pain in both knees, contemporaneous

diagnostic images were entirely normal and clinical findings did not suggest functional limitations. *Id.* at 17, 262.

The ALJ could reasonably conclude that the absence of clinical signs of functional deficits associated with Munroe's complaints suggested her pain was not as severe as she described.  Such medical evidence is relevant to the ALJ's determination of the severity and limiting effects of a claimant's pain and the credibility of the claimant's statements about the pain. *Rollins v. Massanari,* 261 F.3d 853, 857 (9th Cir. 2001); 20 C.F.R. § 404.1529(c)(2); SSR 96-7p, 1996 WL 374186.

The ALJ also relied on Munroe's conservative treatment history.  Although Munroe alleged chronic pain since childhood and disabling pain beginning in December 1997 or earlier, she did not require prescription pain medication until April 2000.  Admin. R. 271.  Dr. Karasek and other medical sources recommended that she simply wait and continue a home exercise program as her primary therapy. *Id.* at 16, 152, 314.  When Dr. Golden offered more aggressive treatment options, Munroe chose not to pursue them.  The ALJ could reasonably infer from this that Munroe's pain was not as severe as she described. *See Parra v. Astrue,* 481 F.3d 742, 750-51 (9th Cir. 2007); *Orn v. Astrue,* 495 F.3d 625, 638 (9th Cir. 2007) (ALJ may reasonably find  subjective statements about disabling symptoms exaggerated, where the claimant fails to obtain treatment designed to alleviate the symptoms).

The ALJ found Munroe obtained effective relief from pain medication and other treatment during the relevant period.  Admin. R. 17.  For example, after receiving Synvisc injections, Munroe reported her knees had never felt better. *Id.* at 258.  She reported a recurrence of neck and back pain when she stopped taking pain medications after reading about potential side effects. *Id.* at 257.  In

assessing the severity of a claimant's pain, the ALJ is entitled to consider the effectiveness of medications in alleviating the pain. 20 C.F.R. § 404.1529(c)(3).

The ALJ found Dr. Karasek's opinion that Munroe was capable of light to sedentary work reflected adversely on Munroe's assertion that her medical condition precluded any work. Admin. R. 16, 146. An ALJ can properly consider the opinion of a claimant's physician concerning the severity and limiting effects of the claimant's symptoms. *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

The ALJ found Munroe's testimony inconsistent with her own prior statements and the contemporaneous reports of medical providers. For example, Munroe testified that she did not return to work because Dr. Karesek would not release her. Admin. R. 361-62. In fact, Dr. Karasek's treatment notes from December 12, 1997, indicate he released her for "sedentary to light" work. *Id.* at 146. In July 1998, Dr. Karasek found all of Munroe's neurological signs within normal limits and opined she was stable with "permanent sedentary light duty restrictions." *Id.* Munroe testified the Synvisc knee joint injections Dr. Falk administered in 2001 did not make her knees feel better and she did not report any improvement to Dr. Falk. *Id.* at 366. Dr. Falk's contemporaneous progress notes indicate Munroe said her knees felt good after beginning the injections: "she states her knees have never felt as good as they do today." *Id.* at 258, 260. The ALJ could reasonably draw from these inconsistencies an adverse inference from about the credibility of Munroe's later description of her symptoms during the relevant period.

The ALJ also believed Munroe's assertion that she fell while grocery shopping undermined her credibility because there was no evidence of a medical basis for any condition that could reasonably be expected to cause her to fall. Munroe did not allege symptoms such as instability, lack

of balance, or vertigo. Nor did she seek urgent care at the time of the fall to determine the cause and prevent future episodes. The ALJ could reasonably believe Munroe was not entirely candid in this instance.

Finally, the ALJ correctly pointed out that Munroe's degenerative condition is progressive and has been worsening over time. Munroe did not assert her present claim until 2005, although she asserts debilitating symptoms since at least 1997. *Id.* at 18. The ALJ found it undermined Munroe's credibility that she did not assert her claim earlier and failed to appeal the prior adverse ruling from December 1997. It is reasonable to expect a claimant to assert her disability claim at about the time she believes she becomes disabled. It is also reasonable to conclude that a progressive degenerative disease process makes it difficult for a claimant to accurately recall the severity and limiting effects of her symptoms several years earlier.

Based on the foregoing, the ALJ stated clear and convincing reasons for discounting Munroe's description of her medical condition and functional limitations during the period from the December 3, 1997, until her insured status expired on December 31, 2001. The ALJ's reasons are sufficiently specific for the court to conclude that she did not discredit Munroe arbitrarily. Accordingly, the ALJ's credibility determination should not be disturbed.

**B.    Treating Medical Sources**

Munroe contends the ALJ improperly rejected Dr. Karasek's statement releasing her for sedentary to light work, and Dr. Falk's diagnoses of lumbar strain and osteoarthritis. An ALJ can reject a treating physician's opinion in favor of the conflicting opinion of another physician, if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." *Thomas v. Barnhart*, 278 F.3d 947, 956-57 (9th Cir. 2002)

quoting *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the treating physician's opinion is not contradicted by another physician, then the ALJ may reject it for clear and convincing reasons. *Id.*

As described previously, Dr. Karasek released Munroe for sedentary to light work at the beginning of the relevant period. When he transferred Munroe's care to Dr. Falk in July 1998, he opined she was medically stable with a permanent sedentary light restriction due to chronic pain in the lumbar spine. *Id.* at 146. The ALJ did not expressly reject Dr. Karasek's opinion, but Munroe argues the ALJ did so implicitly by assessing her with the RFC to perform a reduced range of both light and sedentary work. Munroe argues Dr. Karasek's statements restricted her to sedentary activities excluding all light work.

Munroe's argument is unpersuasive. Had Dr. Karasek intended to limit Munroe to sedentary work, as Munroe now argues, he surely would have done so without utilizing the term light. Nothing suggests Dr. Karasek was aware of the strict technical definitions given by the regulations to the terms of art "sedentary" and "light." *See* 20 C.F.R. § 404.1567. It seems likely he used the terms as a vocational layman to indicate Munroe should not be expected to perform work requiring more than light exertion. This reasonable interpretation of Dr. Karasek's opinion is entirely consistent with the ALJ's RFC assessment limiting Munroe to a reduced range of light and sedentary work, excluding any work that did not permit her to sit or stand at will, required overhead reaching or involved more than occasional twisting. *Id.* at 15.

Even if Dr. Karasek's statements can be interpreted as Munroe claims they should have been, the court may not substitute its interpretation where "the evidence is susceptible to more than one rational interpretation." *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Because the

ALJ's RFC assessment is consistent with the reasonable and likely meaning of Dr. Karasek's statements, there is no basis to imply that the ALJ rejected those statements. Obviously, because the ALJ did not reject Dr. Karasek's statements, she was not required to explain her reasoning for doing so.

As described previously, nurse practitioner Allen in Dr. Falk's clinic treated Munroe for back pain with spasms in December 2000. Allen diagnosed osteoarthritis, presumably in the lumbar spine, and a lumbar strain. *Id.* at 270. Dr. Falk examined Munroe one month later and adopted those diagnoses. *Id.* at 269. In May 2001, Munroe continued to complain of lower back pain, and Dr. Falk prescribed Vicodin. *Id.* at 268. In October 2001, Dr. Falk diagnosed osteoarthritis in the knees. *Id.* at 263. Dr. Falk treated her knee pain with injections, and her pain appeared to be controlled by pain medications through the time her insured status expired. *Id.* at 255-58.

The ALJ correctly pointed out that Dr. Falk did not identify objective findings supporting these diagnoses or clinical findings other than episodic lumbar muscle spasms. *Id.* at 255-70. This reasonably suggests that Dr. Falk relied primarily on subjective reports of symptoms from Munroe in reaching his diagnoses. It is appropriate for an ALJ to reject a physician's opinion that is premised on a claimant's subjective statements which the ALJ has properly discredited. *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

In addition, even if the diagnoses of osteoarthritis and lumbar strain were appropriate and should not have been discounted, the record does not include evidence that these diagnoses imposed specific functional limitations in addition to those in the ALJ's RFC assessment. A diagnosis without significant functional limitations has no consequence in the determination of disability. 20 C.F.R. § 404.1520(c). Here, the record reflects chronic back pain, but does not indicate the intensity

15 - FINDINGS AND RECOMMENDATION

or limiting effects of the pain. Regarding limiting effects of her back pain, Munroe identified only difficulty twisting or rotating in a chair in her statements to Dr. Falk and nurse practitioner Allen. *Id.* at 270. The ALJ incorporated this limitation in her RFC assessment. *Id.* at 15.

Munroe also objects that the ALJ should not have rejected Dr. Falk's diagnosis of lumbar radiculopathy. In May 2002, Munroe complained to Dr. Falk of radiculopathy. Contemporaneously, Dr. Falk obtained no sign of radiculopathy on a straight leg raise test designed to elicit such signs. Dr. Falk diagnosed lumbar radiculopathy, apparently giving greater weight to Munroe's subjective assertions than to his clinical tests. *Id.* at 252. Munroe objects that the ALJ apparently gave diminished weight to Dr. Falk's diagnoses because of his reliance on her subjective statements.

Munroe's argument must be rejected for three reasons. First, Dr. Falk found no indication of radiculopathy at any time before Munroe's insured status expired in December 2001. Even if his diagnosis in May 2002 was appropriate, it does not relate to Munroe's functional capacity during the relevant time. Second, the absence of clinical or objective findings to support the diagnosis again suggests that Dr. Falk relied primarily on Munroe's subjective statements which the ALJ found lacked credibility. Third, Dr. Falk did not identify any functional limitations from this diagnosis that should have been included in the ALJ's RFC assessment. The ALJ's RFC assessment reflected all the functional limitations attributable to Munroe's chronic back pain, whether that pain derives from osteoarthritis, lumbar spasm, or a radicular condition.

In summary, the ALJ did not reject Dr. Karasek's statement indicating Munroe was limited to work requiring sedentary and light exertion. She did not improperly reject Dr. Falk's diagnoses. Any error in evaluating Dr. Falk's diagnoses had no consequence, because the ALJ accounted for all the specific functional limitations supported by the record.

III.    **Step Five**

If a claimant demonstrates she cannot perform her past work, the Commissioner must show that other work exists in the national economy which the claimant can do given her RFC. *Andrews v. Shalala*, 53 F.3d at 1043. The Commissioner can satisfy this burden by eliciting the testimony of a vocational expert ("VE") with a hypothetical question that sets forth all the limitations of the claimant. *Id.*

Here, the ALJ elicited testimony from the VE based on the RFC assessment described previously. The VE testified that a person with such an RFC could perform occupations such as garment folder, label coder, and linen room attendant, which exist in significant numbers in the national economy. Admin. R. 383.

Munroe argues the ALJ should have found her disabled based on 20 C.F.R. Part 404, Subpart P, Appendix 2 ("Medical Vocational Guidelines"). Rule 201.12 of the Medical Vocational Guidelines directs a determination of disability where a claimant over the age of 50 is limited to sedentary work and has only unskilled work experience. Rule 201.12 does not apply in this case because Munroe is not limited to sedentary work. Munroe's RFC assessment limits her to a reduced range of work within both the light and sedentary categories of exertion. Because Munroe's challenges to the ALJ's RFC assessment cannot be sustained, the ALJ did not erroneously fail to apply Rule 201.12.

In conclusion, the ALJ evaluated all of Munroe's allegations of limitations and restrictions in light of all the evidence she presented to support her claim. The ALJ arrived at conclusions supported by inferences reasonably drawn from the record as a whole. The challenges Munroe asserts cannot be sustained. Accordingly, the court should affirm the Commissioner's decision. 42

U.S.C. § 405(g); *Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d at 1193; *Andrews v. Shalala*, 53 F.3d at 1039-40.

## RECOMMENDATION

Based on the foregoing, the ALJ's decision that Munroe did not prove disability and is not entitled disability insurance benefits under Title II of the Social Security Act is based on correct legal standards and supported by substantial evidence. The Commissioner's decision should be affirmed.

*This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.* Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment or appealable order. *Objections to this Report and Recommendation, if any, are due by September 29, 2008. If objections are filed, any responses to the objections are due within 10 days, see* Federal Rules of Civil Procedure 72 and 6. Failure to timely file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to de novo consideration of the factual issues and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation.

DATED this _10_ day of September, 2008.

Mark D. Clarke
United States Magistrate Judge